**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, as liquidating
agent of U.S. Central Federal Credit Union and of
Western Corporate Federal Credit Union,

     Plaintiff - Appellee,

v.

NOMURA HOME EQUITY LOAN, INC.;
WACHOVIA CAPITAL MARKETS, LLC, n/k/a
Wells Fargo Securities, LLC; WACHOVIA
MORTGAGE LOAN AND TRUST, LLC;
NOVASTAR MORTGAGE FUNDING CORP.;
FINANCIAL ASSET SECURITIES CORP.; RBS
ACCEPTANCE, INC., f/k/a Greenwich Capital
Acceptance, Inc.; RBS SECURITIES, INC., f/k/a
Greenwich Capital Markets, Inc.,

     Defendants - Appellants,

and

FREMONT MORTGAGE SECURITIES CORP.;
INDYMAC MBS, INC.; LARES ASSET
SECURITIZATION, INC.; RESIDENTIAL
FUNDING MORTGAGE SECURITIES II, INC.,

     Defendants.

------------------------------

SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,

Nos. 12-3295 and 12-3298

Amicus Curiae.

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. Nos. 2:11-CV-02340-JWL-JPO and 2:11-CV-02649-JWL-JPO)**

Barry Levenstam, Jenner & Block, Chicago, Illinois (Barbara S. Steiner, Matthew J. Thomas, and Casey T. Grabenstein, Jenner & Block, Chicago, Illinois; W. Perry Brandt, Bryan Cave LLP, Kansas City, Missouri; Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, LLP, Topeka, Kansas; Jeffrey J. Kalinowski and Richard H. Kuhlman, Bryan Cave LLP, St. Louis, Missouri; William F. Alderman, Orrick, Herrington & Sutcliffe LLP, San Francisco, California; Timothy B. Mustaine, Foulston Siefkin LLP, Wichita, Kansas; Michael Thompson and Faiza Bergquist, Husch Blackwell LLP, Kansas City, Missouri; and R. Alexander Pilmer, David I. Horowitz, and Tammy A. Tsoumas, Kirkland & Ellis LLP, Los Angeles, California, with him on the briefs), appearing for Appellants.

David C. Frederick, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C. (George Zelcs, Korein Tillery, Chicago, Illinois; Michael J. McKenna, General Counsel, and John K. Ianno, Associate General Counsel, National Credit Union Administration, Alexandria, Virginia; Wan J. Kim and Gregory G. Rapawy, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., with him on the brief), appearing for Appellee.

Ira D. Hammerman and Kevin Carroll, Securities Industry and Financial Markets Association, Washington, D.C., and Michael J. Dell and Aaron M. Frankel, Kramer Levin Naftalis & Frankel LLP, New York, New York, filed an amicus brief for Securities Industry and Financial Markets Association.

Before **KELLY, McKAY,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

The National Credit Union Administration ("NCUA") placed two federally chartered corporate credit unions, U.S. Central Federal Credit Union ("U.S. Central") and

Western Corporate Federal Credit Union ("WesCorp"), into conservatorship. As liquidating agent, NCUA sued 11 defendants on behalf of U.S. Central, alleging federal and state securities violations.[1] In a separate case, NCUA sued one defendant on behalf of U.S. Central and WesCorp, alleging similar federal and state securities violations.[2] The cases were consolidated in the United States District Court for the District of Kansas. We refer to all defendants in these actions collectively as "Defendants."

Defendants moved for dismissal, arguing that NCUA's claims were time-barred. The district court denied the motion, concluding that the so-called Extender Statute applied to NCUA's claims. *See* 12 U.S.C. § 1787(b)(14). Defendants successfully moved for an interlocutory appeal for this court to determine whether the Extender Statute applies to NCUA's claims.

Exercising jurisdiction under 28 U.S.C. § 1292(b), we affirm.

---

[1] The 11 defendants named were Nomura Home Equity Loan, Inc.; RBS Securities, Inc.; Greenwich Capital Acceptance, Inc.; Financial Asset Securities Corp.; Fremont Mortgage Securities Corp.; Residential Funding Mortgage Securities II, Inc. ("Residential"); IndyMac MBS, Inc.; NovaStar Mortgage Funding Corp.; Lares Asset Securitization, Inc. ("Lares"); Saxon Asset Securities Co. ("Saxon"); and Wachovia Mortgage Loan Trust, LLC.

Defendant Saxon was voluntarily dismissed from the case. Defendant Residential declared bankruptcy, making all proceedings against it subject to a bankruptcy stay. Defendant Lares failed to respond to the complaint. [*Id.*] The remaining defendants filed this appeal jointly.

[2] The defendant in the second case is Wachovia Capital Markets, LLC ("Wachovia Capital"). Wachovia Capital is a separate entity from Wachovia Mortgage Loan Trust, LLC, one of the 11 defendants in the first case.

## I. BACKGROUND

We begin by describing several statutes relevant to this litigation. We then summarize the factual and procedural history of the case before turning to a discussion of the issues.

### A. *Securities Laws and the Extender Statute*

This case involves residential mortgage-backed securities ("RMBS"). RMBS are created through securitization by pooling residential mortgage loans and offering prospective investors the opportunity to invest in a particular loan pool through purchase of RMBS certificates granting ownership of a slice of the loan pool. Investors can buy, sell, or hold these RMBS certificates. When homebuyers pay back their loans, investors receive a positive return through payment of dividends and the increased value of the RMBS certificates. *See In re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477, 479 (S.D.N.Y. 2011) (describing mortgage securitization process). Conversely, investors lose money when homebuyers fail to repay their mortgage loans.

Several steps occur before an RMBS certificate can be offered to an investor.

First, the mortgages are separated into "tranches," or classes, based on the estimated risk of default.

Second, a ratings agency assigns a credit rating to each tranche before it is sold. This step signals to investors the risk associated with a given security. Broadly speaking, the ratings agency determines the credit risk of a loan pool based on information about

-4-

each loan in a given tranche, each borrower's creditworthiness, and the proposed capital structure of the loans.

Third, RMBS sellers must file registration statements with the Securities and Exchange Commission ("SEC"), along with a prospectus and other offering documents, which include disclosures about the RMBS being offered. Federal and state securities laws require RMBS sellers to provide investors with truthful and accurate information about the risks involved. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Sellers are liable when offering documents include false and misleading statements.

After the foregoing steps, the RMBS are sold to investors in the form of certificates.

1. **Federal securities laws**

Sections 11 and 12(a)(2) of the Securities Act of 1933 impose liability on certain participants in a registered securities offering that involves material misstatements or omissions. Section 11 applies to registration statements, and Section 12(a)(2) applies to prospectus materials and oral communications.[3]

For private litigants bringing a claim under Sections 11 or 12(a)(2), two deadlines must be satisfied. Both appear in Section 13 of the Securities Act (codified as 15 U.S.C.

---

[3] These provisions are codified at 15 U.S.C. §§ 77k, 77*l*(a)(1), and 77*l*(a)(2). We refer to the claims under these provisions as "Section 11" and "Section 12(a)(2)" claims.

§ 77m),[4] under the heading "Limitation of actions." First, a claim must be brought within one year from the date the violation is discovered or should have been discovered through the exercise of reasonable diligence. Second, a claim is subject to a three-year limit, which provides that "[i]n no event" shall a claim under Section 11 be filed "more than three years after the security was bona fide offered to the public," and no "more than three years after the sale" in the case of a Section 12(a)(2) claim. *Id.* at § 77m.

2. **State securities laws**

The Kansas Uniform Securities Act makes a securities seller liable to a purchaser if the seller sells a security "by means of an untrue statement of a material fact or an omission." K.S.A. § 17-12a509(b). Kansas also sets two deadlines on state securities claims: a two-year limitations period from the date the claim accrues and a five-year deadline from the date of the security's issuance or sale. *Id.* § 17-12a509(j).

The California Corporate Securities Law of 1968 similarly makes a securities seller "liable to the person who purchases a security," Cal. Corp. Code § 25501, when the security has been sold or offered "by means of any written or oral communication which includes an untrue statement of a material fact" or is "misleading," *id.* § 25401. California's deadlines for securities claims are similar to those in Kansas: two years from a plaintiff's discovery "of the facts constituting the violation," or five years from "the act or transaction constituting the violation." *Id.* § 25506(b).

_____

[4] We refer to this time-limit provision as "Section 13."

3. **Time limits specific to NCUA: the Extender Statute**

The Federal Credit Union Act ("FCUA"), enacted in 1934, governs the regulation of federally chartered credit unions. It established NCUA as an independent agency charged with regulating federally chartered credit unions and set the terms of federal insurance coverage for credit union accounts.

If NCUA finds that a credit union is insolvent, or in some circumstances if it is undercapitalized, FCUA directs NCUA to place the credit union in conservatorship or liquidation and appoint itself as conservator or liquidating agent. 12 U.S.C. §§ 1787(a)(1)(A), (a)(3)(A). As conservator or liquidating agent, the Board steps into the shoes of the credit union and succeeds to "all rights, titles, powers, and privileges of the credit union." *Id.* § 1787(b)(2)(A)(i).

In the wake of the savings and loan crisis of the 1980s, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). FIRREA's purpose is to strengthen government regulation of federally chartered or insured financial organizations. *See United States v. Winstar Corp.*, 518 U.S. 839, 844, 856 (1996).

FIRREA contains provisions often referred to as "extender statutes," which extend the time period for a government regulator to bring "any action" on behalf of a failed financial organization. FIRREA has two such provisions with identical language. One applies to NCUA, 12 U.S.C. § 1787(b)(14), and the other to the Federal Deposit Insurance Corporation ("FDIC"), NCUA's counterpart that regulates banks, *id.*

§ 1821(d)(14).  *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (describing the FDIC extender statute).[5]

The NCUA Extender Statute is titled "Statute of limitations for actions brought by conservator or liquidating agent."  12 U.S.C. § 1787(b)(14).  It reads:

> (A) In general
> Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Board[6] as conservator or liquidating agent shall be—
>> (i) in the case of any contract claim, the longer of—
>>> (I) the 6-year period beginning on the date the claim accrues; or
>>> (II) the period applicable under State law; and
>> (ii) in the case of any tort claim, the longer of—
>>> (I) the 3-year period beginning on the date the claim accrues; or
>>> (II) the period applicable under State law.
>
> (B) Determination of the date on which a claim accrues
> For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—
>> (i) the date of the appointment of the Board as conservator or liquidating agent; or
>> (ii) the date on which the cause of action accrues.

Before FIRREA, Securities Act claims brought by the federal government were subject to the limitations provision of 28 U.S.C. § 2415 ("Section 2415").  *See, e.g.*,

---

[5] We discuss multiple extender statutes in this opinion, referring to each according to the agency to which it applies, e.g., "FDIC extender statute."  We refer to the extender statute that applies to the NCUA as the "NCUA Extender Statute" or simply the "Extender Statute."

[6] Here, "the Board" refers to the NCUA Board.  12 U.S.C. § 1752(4).

*FDIC v. Bachman*, 894 F.2d 1233, 1237 (10th Cir. 1990). Section 2415 is the default federal statute of limitations for all actions brought by the federal government when no other statute of limitations applies. *Id.* It reads, in relevant part:

> § 2415. Time for commencing actions brought by the United States
>
> (a) . . . [E]xcept as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues . . . .
>
> (b) . . . [E]xcept as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues . . . .

Congress modeled the two FIRREA extender statutes after Section 2415. Early drafts of FIRREA legislation expressly incorporated "the [limitations] period provided for in section[] 2415." S. 774, 101st Cong. § 212 (as passed by Senate, Apr. 19, 1989) (early version of 12 U.S.C. § 1821(d)(14)), *available at* 1989 WL 1178231, at *44. Later drafts of FIRREA featured separate limitations provisions, which were eventually enacted in their current form, and we refer to them as the extender statutes.

In the FIRREA extender statutes, Congress maintained the basic structure of Section 2415, with a three-year limitations period for tort claims and a six-year period for contract claims. But Congress omitted some portions of Section 2415 from the FIRREA extender statutes. In particular, the phrase "except as otherwise provided by Congress,"

which appears in Section 2415, does not appear in the extender statutes. *Compare* 12 U.S.C. §§ 1787(b)(14), 1821(d)(14), *with* 28 U.S.C. § 2415(a)-(b); *see also FDIC v. Thayer Ins. Agency, Inc.*, 780 F.Supp. 745, 748 (D. Kan. 1991) (recognizing the connection between Section 2415 and the FIRREA extender statutes and describing the latter as "an amended version of the limitations period found in 28 U.S.C. § 2415[].").

In addition to FIRREA's two extender statutes, several other extender statutes have been enacted. In 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), which contained an extender statute for any action brought by the Federal Housing Finance Administration ("FHFA") on behalf of a failed government-sponsored entity, such as Fannie Mae or Freddie Mac. *See* 12 U.S.C. § 4617(b)(12).

Another extender statute appears in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). 42 U.S.C. § 9658. This limitations provision, often referred to as "CERCLA § 309," establishes a federally mandated commencement date for state-law limitations periods on certain claims and provides a minimum time frame for plaintiffs to bring claims regardless of state law.

B.  *Factual History* [7]

1.  **Case No. 12-3295: RMBS purchased by U.S. Central**

The first of the two consolidated cases in this appeal involves 11 defendants, 29 RMBS certificates, and one of the two credit unions, U.S. Central.  On behalf of U.S. Central Credit , NCUA alleged the defendants violated Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2).  NCUA also alleged that one defendant violated the Kansas Uniform Securities Act, K.S.A. § 17-12a509.

U.S. Central was the largest federally chartered corporate credit union in the country before it failed.  In 2006 and 2007, U.S. Central invested in RMBS.  It purchased 29 RMBS certificates issued by 10 of the defendants and underwritten and sold by Defendant RBS Securities Inc.  When U.S. Central made these purchases, nearly all certificates were assigned the highest possible investment rating, indicating they were low-risk investments.  But over the next four years, most of the certificates performed so poorly that their credit ratings were "downgraded to well below investment grade." Appx. at 305.  In other words, the certificates were reclassified to a credit rating commonly referred to as "junk" grade.  *See Cody v. SEC*, 693 F.3d 251, 255 (1st Cir. 2012).

---

[7] We recite the facts in this case as we must view them:  "[A]s with any motion to dismiss for failure to plead a claim on which relief can be granted, [courts must] accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

-11-

2. **Case No. 12-3298: RMBS purchased by U.S. Central and WesCorp**

The second of the two consolidated cases involves one defendant, five RMBS certificates, and two credit unions, U.S. Central and WesCorp. On behalf of the credit unions, NCUA alleged violations of Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), the California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25401, 25501, and the Kansas Uniform Securities Act, K.S.A. § 17-12a509.

The credit unions purchased these RMBS certificates in 2006. NCUA alleged that U.S. Central and WesCorp relied on misleading statements in the offering documents that the five RMBS certificates were "extremely safe." Aplee. Br. at 8. As with the first case, the RMBS were highly rated at the time of purchase but experienced a "surge in borrower delinquencies and defaults," resulting in significant losses and a "collapse[]" of their credit ratings. Appx. at 375-76.

3. **Both cases**

According to NCUA, by "May 2011, nearly half (45.73%) of the mortgage collateral across all of the [RMBS] . . . was in delinquency, bankruptcy, foreclosure, or was . . . [owned by a bank or lending institution] after a failed sale at a foreclosure auction." *Id.* at 303. This resulted in staggering losses for the credit unions. Together, the credit unions paid $1.74 billion for the RMBS involved in both cases, and losses from these failed investments contributed to the demise of both organizations. NCUA placed

both credit unions in conservatorship in March 2009, then in involuntary liquidation in October 2010.

After taking over the credit unions, NCUA began investigating these RMBS. It reviewed the offering documents, which had represented that "[t]he mortgage loans [had] been originated generally in accordance with" industry underwriting standards, Appx. at 307, and that the mortgages in the RMBS pool had "zero or near zero delinquencies and defaults," *id.* at 302. NCUA concluded that at the time the RMBS certificates were sold, they were "significantly riskier than represented in the [o]ffering [d]ocuments" and that "a material percentage of the borrowers whose mortgages comprised the [RMBS] were all but certain to become delinquent or [in] default shortly after origination." *Id.* at 301-02 (quotations omitted).

NCUA further concluded that the offering documents contained materially false and misleading statements about the credit worthiness of the mortgage borrowers and the underwriting practices used by originators of the mortgages. NCUA claims these materially false and misleading statements concealed underwriters' "shoddy" practices and "systematic disregard[ ]" of their own guidelines and industry standards. *Id.* at 305, 308-09 & n.1.

C. *Procedural History*

In June 2011, NCUA filed a complaint in the United States District Court for the District of Kansas on behalf of U.S. Central, naming 11 defendants. In November 2011, NCUA filed a separate complaint in the same court on behalf of both U.S. Central and

-13-

WesCorp against a single defendant, Wachovia Capital Markets, LLC, alleging similar violations of federal and state securities laws concerning the five RMBS certificates purchased by both credit unions.

The two cases were consolidated in the district court in June 2012. Most of the defendants filed a joint motion to dismiss both cases pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting multiple grounds for dismissal, including timeliness.

In July 2012, the district court granted the motion to dismiss as to some claims unrelated to this appeal and denied the motion as to other claims. The district court certified certain issues for interlocutory appeal in November 2012, and we granted a petition for interlocutory appeal over NCUA's objection. The scope of this interlocutory appeal is limited to the meaning of the Extender Statute.

## II. **DISCUSSION**

Defendants make two arguments that NCUA's claims are untimely. First, they argue that the Extender Statute does not apply to repose periods and that Section 13's three-year period is a repose period. Under this theory, the Securities Act claims would be untimely because NCUA brought them more than three years after the RMBS were offered and purchased.[8] Second, Defendants argue that the Extender Statute covers only

---

[8] Although the Kansas and California securities laws contain statutes of repose—five years in both states—Defendants do not argue that these state repose periods bar NCUA's state law claims.

state common law claims.  Under this theory, the Extender Statute would not apply to any of NCUA's claims—all of which are statutory.[9]

We consider these questions of statutory interpretation de novo.  *United States v. Manning*, 526 F.3d 611, 614 (10th Cir. 2008).

A. ***Does the Extender Statute Apply to Section 13's Three-Year Period?***

As discussed above, Section 13 sets forth two separate time limits for federal Securities Act claims:  (1) a one-year limit, which begins from the date the claim is discovered or reasonably should have been discovered; and (2) a three-year limit from the date the security is offered or sold, depending on whether the claim falls under Section 11 or Section 12(a)(2).  15 U.S.C. § 77m.  Both time limits appear under the heading "Limitation of actions."  *Id.*

---

[9] If Defendants were to prevail on this second argument, all claims would likely be untimely—either by virtue of the one-year limitations period in Section 13 and in both state securities laws or by virtue of Section 13's three-year period.

NCUA's claims must meet all applicable deadlines under the federal and state laws.  As to the Securities Act, only the three-year deadline is relevant to this appeal.  Even if NCUA prevails on this appeal, the one-year deadline could still bar any of the claims if the district court finds that the credit unions discovered or reasonably should have discovered the alleged violations more than a year before NCUA's appointment as receiver.  This would mean that "the claims here were not live when [NCUA] was appointed receiver" and would therefore be untimely now.  *FDIC v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973, at *2 (C.D. Cal. Nov. 21, 2012).

As to state law deadlines, only the one-year statute of limitations period is relevant to this appeal because, as we note in the footnote above, Defendants do not attempt to argue that the five-year state repose periods bar NCUA's state law claims.

Several matters are not contested. First, the parties agree the RMBS certificates were offered and sold more than three years before NCUA filed its claims. The Securities Act claims are therefore untimely under Section 13's three-year period unless the Extender Statute applies. The parties and the district court also agree, as do we, that this three-year period is not an ordinary statute of limitations, but rather a statute of repose.[10]

Defendants argue that statutes of limitations and repose are fundamentally distinct categories and that the Extender Statute does not cover repose periods.

We first explain why Section 13's three-year period is a repose period. We then turn to the Extender Statute's language to determine whether it covers the repose period in this case.

1. **Section 13's three-year period is a statute of repose**

A statute of repose is similar to an ordinary statute of limitations in that both types of provisions "function as filing deadlines." *Iacono v. Office of Pers. Mgmt.*, 974 F.2d 1326, 1328 (Fed. Cir. 1992). But unlike an ordinary statute of limitations, which begins running when an injury is discovered or reasonably should have been discovered—i.e., when the claim accrues—"[a] statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." *Munoz v. Ashcroft*, 339 F.3d 950, 957 (9th Cir. 2003); *see also Alexander v. Beech Aircraft Corp.*,

_____

[10] Everyone also agrees that Section 13's one-year period is an ordinary statute of limitations. Only the three-year limit is at issue in this appeal.

952 F.2d 1215, 1218, n.2 (10th Cir. 1991) (In a statute of repose, "[t]he bar . . . is tied to an independent event.").[11]

A statute of repose may extinguish a plaintiff's cause of action "whether or not the plaintiff should have discovered within that period" that there was a violation or an injury. *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 733 (7th Cir. 2010) (discussing products liability repose period). An ordinary limitations period is "a procedural device" that may be tolled for equitable reasons. *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996) (quotations omitted); *see also FHFA v. UBS Am. Inc.*, 712 F.3d 136, 140 (2d Cir. 2013). In contrast, a repose period "creates a substantive right in those protected to be free from liability after a legislatively-determined period of time," and may not be equitably tolled. *Amoco Prod.*, 85 F.3d at 1472 (quotations omitted).[12]

---

[11] Another helpful explanation is that both statutes of limitation and statutes of repose "prescribe the time period within which a plaintiff may commence an action," but

> [t]he distinguishing feature between the two is the time at which the respective periods commence. . . . Unlike an ordinary statute of limitations, which begins running upon accrual of the claim, the period specified in a statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.

54 C.J.S. *Limitations of Actions* § 7 (2013).

[12] Although statutes of repose are not subject to *equitable* tolling, they are "subject . . . to legislatively created exceptions." *Police & Fire Retirement Sys. v. IndyMac MBS, Inc.*, 2013 WL 3214588, --- F.3d ---, *4 (2d Cir. 2013) (quotations omitted). In a few cases, courts have referred to such legislative exceptions as "legal tolling." *See, e.g.*,

Continued . . .

Section 13 does not use the word "repose." Both the one-year and three-year time limits in Section 13 appear under the title "Limitation of actions." *See* 15 U.S.C. § 77m. Nevertheless, the parties and the district court agree, as do we, that Section 13's one-year limit is an ordinary statute of limitations and the three-year limit is a statute of repose. As we discuss later, "[b]oth types of statutes are often referred to as statutes of limitations." *Alexander*, 952 F.2d at 1218 n.2.

Section 13's one-year limit commences when the violation is discovered or should have been discovered through the exercise of reasonable diligence. *See* 15 U.S.C. § 77m. It is therefore an ordinary limitations period. By contrast, the three-year limit provides that "[i]n no event shall any . . . action be brought" more than three years after a security is sold or offered to the public. *Id.* This language sets a fixed point of commencement from the date of a defendant's wrongful action, not the date of injury or discovery. The three-year period is therefore a repose period. *See Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1434 (10th Cir. 1991), *vacated on other grounds by Dennier v. Trippet*, 503 U.S. 978 (1992).

We turn now to the Extender Statute's language and address the question at issue in this appeal: whether the Extender Statute supplants Section 13's three-year repose period.

_____

Cont.

*Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1419 n.6 (2012); *Joseph v. Wiles*, 223 F.3d 1155, 1166-67 (10th Cir. 2000).

2. **The meaning of the Extender Statute**

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If it does, "our inquiry must cease," *id.*, and "the plain meaning of the statute controls," *United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002); *see also Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1233 (10th Cir. 2006) ("[T]he court 'must give effect to the unambiguously expressed intent of Congress.'" (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000))).

If, on the other hand, the language is ambiguous, then "we must turn to other sources to find its meaning." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1237-38 (10th Cir. 2010); *see also Robinson*, 519 U.S. at 345-46 ("resolv[ing] . . . ambiguity" in a statute by looking to its "broader context" and "primary purpose"); *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1143 (10th Cir. 2005) (if a statute is ambiguous, "we must dig further" to determine its meaning); *Quarrell*, 310 F.3d at 669 ("[I]f an ambiguity is found, a court may seek guidance from . . . the purpose behind the statute." (quotations omitted)).

A statute is ambiguous if it is reasonably "susceptible to more than one interpretation," *Wright*, 451 F.3d at 1235, or "'capable of being understood in two or more possible senses or ways,'" *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)); *see also*

*Robinson*, 519 U.S. at 345; *Quarrell*, 310 F.3d at 669 ("[A] statute is ambiguous when it is 'capable of being understood by reasonably well-informed persons in two or more different senses.'" (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1178 (10th Cir. 2002))).

We first examine the language of the Extender Statute to determine whether it has a plain and unambiguous meaning as to statutes of repose. We find the plain meaning of the text best supports the conclusion that the Extender Statute supplants all other limitations frameworks, including both the one-year and three-year provisions in Section 13. We then consider Defendants' arguments regarding the meaning of "statute of limitations" in the Extender Statute and recognize that the term is potentially ambiguous. After consulting several sources to resolve the ambiguity, we confirm our initial finding that the Extender Statute applies to periods of repose like Section 13's three-year period.

a. *Plain meaning analysis*

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *Sierra Club*, 421 F.3d at 1143; *S. Utah Wilderness Alliance*, 620 F.3d at 1238. As applied to this case, we (i) examine the Extender Statute's language, (ii) review various sources to identify the ordinary meaning of the term "statute of limitations" at the time Congress enacted the Extender Statute, (iii) consider the surrounding language in the statute (specific context),

and (iv) look to how the term is used in surrounding provisions of FIRREA (broader context).

(i) The Extender Statute's language

The Extender Statute extends "*the* applicable statute of limitations" for "*any* action brought by" NCUA on behalf of a failed credit union.  12 U.S.C. § 1787(b)(14)(A) (emphasis added).  Application of the Extender Statute is mandatory.  *Id.* ("the applicable statute of limitations . . . *shall be* . . ." (emphasis added)).  *See Mallard v. United States Dist. Ct.*, 490 U.S. 296, 302 (1989) (use of "shall" indicates a statutory instruction is "compulsory" and "mandatory").

"By using these words, Congress precluded the possibility that some other limitations period might apply to claims brought by [NCUA] as conservator [or receiver]."  *UBS Am. Inc.*, 712 F.3d at 142 (discussing the FHFA extender statute, which is identical to the NCUA Extender Statute).  Thus, the plain meaning of the statute indicates that it applies to NCUA's Securities Act claim and that it supplants all other time limits, including Section 13's repose period.  We therefore agree with the Second Circuit that this is the natural and correct reading of this language.  *Id.* at 141-42.

Defendants argue that the term "statute of limitations" in the Extender Statute does not include statutes of repose.  It follows, they say, that the Extender Statute replaces only Section 13's one-year period and not its three-year period.  But Defendants misread the Extender Statute.

The term "statute of limitations" is phrased in the singular—it follows the word "*the*" and uses the word "*statute*," not "statutes." 12 U.S.C. § 1787(b)(14)(A) (emphasis added). This term refers to the time limits in the Extender Statute itself—subparagraphs (A) and (B)—not the time periods in other statutes that the Extender Statute replaces, such as those in Section 13. And it applies to "*any action* brought by [NCUA]." *Id.*

Although Defendants contend that their reading of the Extender Statute is plain and unambiguous, it is the opposite—at best a strained reading that may be plausible only if the term "statute of limitations" in the Extender Statute can be (1) understood narrowly and (2) somehow refers to time restrictions contained in statutes other than the Extender Statute.

Rather than stop here and conclude, as the Second Circuit did in *UBS*, that the Extender Statute is plain and unambiguous in NCUA's favor, we assume for the sake of discussion that the Defendants' reading based on the text alone is at least plausible. We therefore examine the term "statute of limitations" more closely. The following contextual analysis further demonstrates the weakness of the Defendants' interpretation of the Extender Statute—and the correctness of the district court's conclusion that the Extender Statute governs NCUA's Securities Act claims and supplants other limitations frameworks.

(ii) Ordinary meaning of "statute of limitations"

When interpreting a statute, we must "giv[e] all undefined terms their ordinary meaning." *UBS Am.*, 712 F.3d at 141; *Schindler Elevator Corp. v. United States ex rel.*

-22-

*Kirk*, 131 S. Ct. 1885, 1891 (2011). We first assess the way the term is used. Because words do not have "intrinsic meanings. . . . [i]t is only through custom, usage, and convention that language acquires established meanings." Norman J. Singer & J.D. Shambie Singer, 2A *Sutherland Statutory Construction* § 45:2, at 14-15 (7th ed. 2007).

"Importantly, the proper inquiry focuses on the ordinary meaning of the [term] at the time Congress enacted it." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004). "[T]he terms 'statute of limitations' and 'statute of repose' have seen considerable development in their usage and meaning." *Waldburger v. CTS Corp.*, 2013 WL 3455775, at *6, -- F.3d -- (4th Cir. 2013). "[A] historical analysis reveals that both scholars and courts have often used the terms interchangeably." *Id.* (citing *McDonald v. Sun Oil. Co.*, 548 F.3d 774, 781 (9th Cir. 2008) ("[A]lthough some cases recognized the differences between statutes of limitation and repose [in 1986], a number of cases confused the terms or used them interchangeably . . . [and] considerable uncertainty about the distinction existed."); *id.* at 781 nn.3-4 (collecting historical examples of inconsistent and overlapping use of the two terms)).

A review of sources published before and shortly after Congress enacted the Extender Statute indicates that "statute of limitations" did not have a consistent, clearly distinct meaning in 1989. *See UBS Am.*, 712 F.3d at 142-43 & n.3; *Waldburger*, 2013 WL 3455775, at *7, -- F.3d at --. Courts often begin an ordinary meaning analysis by consulting contemporary dictionary definitions. *See, e.g.*, *Permanent Mission of India to the United Nations v. City of New York*, 127 S. Ct. 2352, 2356 (2007) (consulting the

-23-

fourth edition of Black's Law Dictionary to interpret a federal statute adopted in 1976); *Limtiaco v. Comacho*, 127 S. Ct. 1413, 1418 (2007) (consulting the fourth edition of Black's Law Dictionary published in 1951 to interpret a Guam statute enacted in 1950); *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 125-26 (2003) (consulting law dictionaries published in 1856 and 1859 to interpret a statute adopted in 1863).

The fifth edition of Black's Law Dictionary was published in 1979 and was current when FIRREA was enacted. It did not provide a definition for statutes of repose. Instead, the entry for "Repose statutes" redirected the reader to the entry for "Limitation (Statute of limitation)." Black's Law Dictionary 1169 (5th ed. 1979). The entry for "Statute of limitations" in the same edition referred twice to statutes of repose. First, it stated that "[s]tatutes of limitation are statutes of repose, and are such legislative enactments as prescribe the periods within which actions may be brought upon certain claims or within which certain rights may be enforced." *Id.* at 835. Second, the final sentence of the entry stated: "Also sometimes referred to as 'statutes of repose.'" *Id.*[13]

---

[13] The next edition of Black's Law Dictionary, published in 1994, provided a separate entry for "Statute of repose" that addressed the distinctions between repose and limitations periods. Black's Law Dictionary 1411 (6th ed. 1994). Nevertheless, the entry for "Statute of limitations" begins with a broad definition: "Statutes . . . setting maximum time periods during which certain actions can be brought or rights enforced." *Id.* at 927. Later in the same entry is a note with the subheading "Statute of repose compared." That note begins with the sentence, "While statutes of limitation are sometimes called 'statutes of repose' . . . " and proceeds to explain the distinctions we already have discussed. *Id.* at 927.

Beyond dictionary definitions, the Supreme Court used the terms "statute of limitations" and "statute of repose" synonymously in cases published before the Extender Statute's enactment. *E.g.*, *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (referring to statutes of limitations generally as "statutes of repose"); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 136 (1938) (referring to a statute of limitations: "The statute of limitations is a statute of repose . . . .").

A 1991 treatise on limitations of actions described five definitions for statute of repose:

> (1) in the most general sense, statute of repose is synonymous with statute of limitations; (2) [it] is a general term that encompasses various statutes, including statutes of limitations . . . ; (3) it is merely one type of statute of limitations . . . ; (4) [it] is considered distinct from a statute of limitations because it begins to run at a time unrelated to the traditional cause of action, that is, from the date of the act of injury regardless when discovered; and (5) it is synonymous with the "useful safe life" provisions of products liability statutes.

Calvin W. Corman, 1 *Limitation of Actions* § 1.3.2.1, at 30-31 (1991). Applying these definitions to the term "statute of limitations" in the Extender Statute, only the fourth definition supports Defendants' narrow reading, while the first, second, and third definitions support a broader reading and the fifth definition is irrelevant.

The foregoing discussion supports the broader meaning of "statute of limitations." But it also shows that, standing alone, the words "statute of limitations" may be ambiguous.[14]

### (iii) Specific context: surrounding language

The Extender Statute set a new limitations framework that displaced pre-existing limitations frameworks for "any action" brought by NCUA. 12 U.S.C. § 1787(b)(14) ("[T]he applicable statute of limitations with regard to any action . . . shall be . . . "). In defining the new limitations framework, the Extender Statute provides this instruction:

> (B) Determination of the date on which a claim accrues
> [T]he date on which the statute of limitation begins to run . . . shall be the later of—
> (i) the date of the appointment of [NCUA] as conservator or liquidating agent; *or*
> (ii) the date on which the cause of action accrues.

---

[14] Courts have noted the historically ambiguous and overlapping use of these terms. *E.g.*, *FHFA v. UBS Am. Inc.*, 712 F.3d 136, 140, 142-43 & n.3 (2d Cir. 2013) ("[C]ourts . . . have long used the term 'statute of limitations' to refer also to statutes of repose." (referring, inter alia, to *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 (1976))); *Fields v. Legacy Health Sys.*, 413 F.3d 943, 952 n.7 (9th Cir. 2005) ("[T]he distinction between statutes of limitations and statutes of repose is often blurred."); *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1218, n.2 ("Although the statute is titled as a 'Statute of limitations,' we refer to it as a statute of repose. . . . Both types of statutes are often referred to as statutes of limitations."); *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1434 n.17 (10th Cir. 1991), *vacated on other grounds by Dennier v. Trippet*, 503 U.S. 978 (1992) ("Although the two concepts differ," the terms statute of limitations and statute of repose "have become interchangeable.").

*Id.* § 1787(b)(14)(B) (emphasis added). The statute uses the word "accrues" two additional times in defining the length of the new limitations period. *See id.* § 1787(b)(14)(A)(i)(I) & (ii)( I).

As the language quoted above shows, the Extender Statute's new limitations framework includes the concept of accrual. As Defendants argue, accrual is generally associated with the narrow meaning of "statute of limitations." But the Extender Statute also includes the concept of repose. Subsection (B) provides that the limitations period begins to run either (i) on "the date of the appointment of [NCUA] as conservator or liquidating agent" or (ii) when "the cause of action accrues." Option (i) invokes repose language.

Defendants argue that the Extender Statute's reference to accrual means that it may only apply if the time limit being displaced is also subject to accrual—that is, when the displaced time limit falls within the narrow meaning of "statute of limitations." But this argument confuses what the Extender Statute *does*—sets an all-purpose time frame for NCUA to bring enforcement actions on behalf of failed credit unions—with what it *replaces*—the preexisting time frames to bring "any action."

The references to accrual appear in the portion of Extender Statute that defines its own new limitations framework—what it does. The references do not expressly limit what time limits the statute replaces. The mere fact that the new time period in the Extender Statute could be subject to accrual does not prevent it from displacing a time limit that is not, i.e., a repose period.

-27-

Thus, the statute is most reasonably interpreted to govern "any action" NCUA may bring—and to displace *all* "statutes of limitations" in the broad sense of the term, which encompasses both ordinary statutes of limitations and statutes of repose.

### (iv)   Broader context:  Surrounding provisions of FIRREA

By itself, the ordinary meaning of the term "statute of limitations" is ambiguous. "Statutory construction, however, is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also UBS Am.*, 712 F.3d at 141 ("[C]ourts are not to construe each phrase . . . in isolation." (quotations omitted)).  We therefore look to the surrounding provisions of FIRREA to see if this context makes the meaning clear.

FIRREA is codified in Title 12, Chapter 14 of the U.S. Code.  Section 1752 provides general definitions for the chapter, but "statute of limitations" is not among the terms defined.  Even when a statute does not explicitly define a particular term, we might gain understanding of the term from how it is used elsewhere in the statute.

Defendants define "statute of limitations" as a period that commences on the date a cause of action accrues.  And they argue that any time limit that is "triggered by an arbitrary event unrelated to the accrual of the cause of action" is plainly inconsistent with this narrow definition.  Aplt. Br. at 29-31 (quotations omitted).  If they are correct that the term has an unambiguous, narrow meaning in the Extender Statute, then we would expect to find the term used narrowly in other parts of the statute.  But this is not the case.

-28-

Section 1787 of FIRREA includes the Extender Statute. This section, inter alia, defines NCUA's powers and duties as conservator or liquidating agent, governs the process of winding up a failed credit union (including claims against the credit union), and provides for payment of claims on insured deposits. *See generally* 12 U.S.C. § 1787. Section 1787 refers to "statute of limitations" or "statute of limitation" in six provisions, including the Extender Statute.[15] The word "repose" does not appear. Two references to statutes of limitations in § 1787 could arguably meet Defendants' narrow definition. These two provisions provide for tolling of "any applicable statute of limitation" when an external claimant files a claim with NCUA against a failed credit union, s*ee* 12 U.S.C. §§ 1787(b)(5)(F)(i), (b)(8)(E). As noted previously, the availability of tolling distinguishes ordinary statutes of limitations from statutes of repose. These provisions are consistent with the broad definition of "statute of limitations" because the broad encompasses the narrow, but they do not foreclose the narrow definition.

_____

[15] Besides the Extender Statute, the term "statute of limitation(s)" appears in the following provisions: 12 U.S.C. § 1787(b)(5)(F)(i) (tolls "any applicable statute of limitations" on external claims against a credit union when the claimant files a claim with NCUA); *id*. at § 1787(b)(6)(B) (sets a 60-day "[s]tatute of limitations" for federal court review or administrative appeal of external claims denied by NCUA); *id*. at § 1787(b)(8)(D) (sets 30-day "[s]tatute of limitations" for federal court review or administrative appeal of external claims denied by NCUA under expedited claims process); *id.* at § 1787(b)(8)(E) (allows tolling of "any applicable statute of limitations" on external claims against a credit union when claimant files a claim with NCUA under expedited claims process); *id.* at § 1787(d)(4) (sets a "[s]tatute of limitations" of "not later than 60 days" for filing a federal court challenge to NCUA's denial of claim for payment of an insured deposit).

Other § 1787 provisions, however, use the term in a way that is inconsistent with the Defendants' narrow definition. Three subsections set deadlines for appealing NCUA's denial of a claim, without allowing for accrual or tolling—yet all are clearly labeled "statutes of limitations." *See id.* §§ 1787(b)(6)(B), (b)(8)(D), (d)(4). One of these deadlines, § 1787(d)(4), is "not later than 60 days after the date on which" NCUA's decision is issued. *Id.* Like the three-year repose period in Section 13, this 60-day period sets a fixed time limit and commences from the date of the challenged event—not the date of discovery or accrual, as is the case with ordinary statutes of limitations, such as Section 13's one-year period.

In short, Congress's use of "statute of limitations" throughout § 1787 does not support Defendants' argument that the term's meaning is unambiguously narrow. To the contrary, some of the § 1787 references suggest a broader meaning that would encompass statutes of repose.

\* \* \*

In sum, we started by examining the Extender Statute's text. We found that its time periods' application to "any action" indicates that the Extender Statute supplants any other time periods that otherwise would apply to NCUA claims. We then focused on the term "statute of limitations" in the Extender Statute to determine whether Defendants' narrow view of the statute's coverage holds water. We recognized that "statute of limitations" standing alone can be ambiguous, but our contextual analysis showed that

the term is used broadly in the Extender Statute to cover statutory time limits generally, including repose periods.

Although all signs point to the Extender Statute's application to Section 13's three-year period, we will again give Defendants the benefit of the doubt and assume there may be a modicum of ambiguity as to whether the Extender Statute covers statutes of repose. But any such ambiguity is easily resolved, as the ensuing discussion shows.

3. **Resolving ambiguity in the Extender Statute**

The preceding discussion goes a long way to resolving any ambiguity about the Extender Statute's coverage because the language and context strongly suggest the Extender Statute supplants any other time limits for any claim NCUA brings on behalf of a failed credit union.

To the extent any lingering ambiguity must be resolved, "we must turn to other sources to find its meaning." *S. Utah Wilderness Alliance*, 620 F.3d at 1237-38; *see also Robinson*, 519 U.S. at 345; *Quarrell*, 310 F.3d at 669. We examine "the purpose and scope" of FIRREA and the Extender Statute specifically. *UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173, 1178 (10th Cir. 1999); *see also Robinson*, 519 U.S. at 346 (considering the "primary purpose of antiretaliation provisions" in Title VII in interpreting whether an ambiguous statutory reference to "employee" included former employees). We then consider the use of the term "statute of limitations" in federal legislation generally and in case law. We conclude by addressing Defendants' remaining arguments on this issue.

a. *Statutory purpose*

"Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country . . ." *McCreary Cnty v. ACLU*, 545 U.S. 844, 861 (2005). "'Our task is to interpret the words of the statute in light of the purposes Congress sought to serve.'" *Wright*, 451 F.3d at 1234 (quoting *Hain v. Mullin*, 436 F.3d 1168, 1176 (10th Cir. 2006) (en banc)); *Quarrell*, 310 F.3d at 669 ("A court can . . . resolve ambiguities by looking at the purpose behind the statute."); *In re Geneva Steel Co.*, 281 F.3d at 1178 ("Ambiguous text can . . . be decoded by knowing the purpose behind the statute"); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377-80 (2004) (looking to statutory purpose to interpret an ambiguous statute); *Reeves v. Ernst & Young*, 494 U.S. 56, 73 ("Given this ambiguity, the [provision] must be interpreted in accordance with its purpose.").

Congress enacted FIRREA in the wake of the widespread financial crisis caused by failures of savings and loan associations in the late 1980s. It did so to "prevent[] the collapse of the industry, attack[] the root causes of the crisis, and restor[e] public confidence." *Winstar Corp.*, 518 U.S. at 844, 856. The preamble to the bill described FIRREA as "An Act to reform, recapitalize, and consolidate the Federal deposit insurance system, to enhance the regulatory and enforcement powers of Federal financial institutions regulatory agencies, and for other purposes." FIRREA, Pub. L. No. 101-73, 103 Stat. 183. FIRREA's stated purpose also included "[t]o strengthen the enforcement powers of Federal regulators of depository institutions," *id.* § 101(9), and "[t]o strengthen

the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors," *id.* § 101(10).[16] The legislation also was designed "to curtail investments and other activities of savings associations that pose unacceptable risks to" federally insured deposits. H.R. Rep. No. 101-222, at 393 (1989) (Conf. Rep.), *reprinted in* 1989 U.S.C.C.A.N. 432.

FIRREA's sponsor said the extender provisions should "be construed to maximize potential recoveries . . . by preserving to the greatest extent permissible by law claims [filed by the Government] that would otherwise have been lost due to the expiration of hitherto applicable limitations period." 135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) (statement of Senator Donald W. Riegle, Jr., then-Chairman of the Committee on Banking, Housing, and Urban Affairs and sponsor of FIRREA in the Senate, regarding the FDIC extender statute, which is identical to the NCUA Extender Statute). "In interpreting a statute, we accord substantial weight to statements by its sponsors concerning purpose and scope." *UMLIC-Nine-Corp.*, 168 F.3d at 1178; *see also Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976). We have previously relied on this statement and similar statements in the legislative record when interpreting the purpose and scope of the FIRREA extender statutes, as have other circuits. *See*

---

[16] The Extender Statute was a relatively small part of FIRREA's large legislative scheme. But regardless whether the statutory language at issue is the centerpiece of a legislation or a minor provision, "[i]t is a cardinal canon of statutory construction that statutes should be interpreted harmoniously with their dominant legislative purpose." *United States v. Gallenardo*, 579 F.3d 1076, 1085 (9th Cir. 2009).

*UMLIC-Nine Corp.*, 168 F.3d at 1178 (relying on the same statement by Sen. Riegle);

*SMS Fin., LLC v. ABCO Homes, Inc.*, 167 F.3d 235, 242 n.21 (5th Cir. 1999) (relying on

similar comments concerning the purpose of the extender statutes); *FDIC v. N.H. Ins.*

*Co.*, 953 F.2d 478, 486-87 & n.2 (9th Cir. 1991) (relying on the same statement by Sen.

Riegle).

Defendants counter that FIRREA's main purpose was to strengthen the FDIC.

They argue that the NCUA provisions were not the main focus of the legislation. But

even if that is true, it does not change our analysis. Congress enacted both extender

statutes simultaneously, using identical language. It is reasonable to conclude that the

purpose and meaning Congress ascribed to one applies to the other.[17]

Defendants also invoke the legislative history of Section 13, suggesting that

Congress meant the three-year period to be absolute. They cite to statements from a 1934

legislative debate that "no suit under any circumstances shall be brought after 3 years."

*See* 78 Cong. Rec. S8201 (daily ed. May 7, 1934) (statement of Sen. Barkley), *reprinted*

*in 1 Federal Securities Laws – Legislative History 1933-1982*, at 1011 (Fed. Bar Ass'n

1983). But these references do not tell us anything about the purpose of the Extender

Statute, which was enacted more than 50 years after Section 13, or its effect on Section

---

[17] Defendants also note that the legislative history of the Extender Statute does not explicitly reference "repose periods." But this begs the question whether "statute of limitations" was used in a broad sense that would include statutes of repose. Defendants have not cited, and we have not found, any guidance in the legislative history that suggests statute of limitations should be construed in the narrow sense they propose.

13. And as NCUA notes, the statements Defendants cite appear in a debate regarding whether the three-year period would be subject to a discovery rule, not whether later-enacted extender statutes would apply. Moreover, in the surrounding portions of Section 13's legislative record, the three-year period is repeatedly referred to as a "statute of limitations," not a "statute of repose." *See id* at 8197-8203.

In sum, the legislative purpose of FIRREA supports the conclusion that the Extender Statute applies to statutes of repose.

b. *Use of "statute of limitations" in federal legislation*

Our review of federal legislation generally suggests that when legislation "uses the term 'statutes of limitation,' it generally contemplates all limitation statutes, including statutes of repose." *Wenke v. Gehl Co.*, 682 N.W.2d 405, 415 (Wis. 2004).[18] Indeed, Congress has very rarely used the terms "statute of repose" or "repose period." A district court recently found only "[a] single uncodified law using the term ['repose']" with respect to timeliness. *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 900 F. Supp. 2d 1055, 1065 (C.D. Cal. 2012) (hereinafter "*In re Countrywide*"); *see also*

---

[18] Defendants disagree. They point to "[t]he preeminent canon of statutory interpretation [that] requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Relying on this canon, they argue that because Congress referred only to statutes of limitation, and not to statutes of repose, it meant to include the former and exclude the latter. Apart from Defendants' continued misreading of the term "statute of limitations" in the Extender Statute as referring to time limits outside the Extender Statute, this argument is further flawed. It simply assumes the narrow meaning of "statute of limitations" and sheds no light on whether Congress actually used the term narrowly or broadly.

*McDonald*, 548 F.3d at 784 ("[A]n electronic search of the text of the United States Code

also fails to reveal a single instance of the phrase 'statute of repose.'").

In contrast, one court has noted,

> Congressional statutes continue to use the term
> 'statutes of limitations' to encompass statutes of repose . . .
> The United States Code is littered with statutory provisions
> entitled 'statute of limitations,' 'time limits,' 'time
> limitations' and 'limitations of actions,' that regulate both
> when plaintiffs can bring a claim after discovery of their
> rights and when plaintiffs are absolutely barred from bringing
> a claim.

*In re: Countrywide*, 900 F. Supp. 2d at 1063; *see also UBS Am.*, 712 F.3d at 143, n.4

(agreeing with *In re: Countrywide*).[19]

This indicates that the absence of the word "repose" in the Extender Statute is not,

as Defendants argue, a "deliberate omission" meant to exclude repose periods from the

statute's coverage. Aplt. Br. at 9.

c. *Use of "statute of limitations" in case law*

Our review of case law indicates that federal courts' use of the term "statute of

limitations" in their decisions reinforces the broader meaning of the term. *See Stewart v.*

---

[19] For example, the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804, 116 Stat. 745 (2002) (codified at 28 U.S.C. § 1658), contains a provision modifying the limitation and repose periods for Securities Act claims that is titled "Statute of Limitations for Securities Fraud." Another example is the Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159, § 156, 117 Stat. 1952 (2003) (codified at 15 U.S.C. § 1681p), in which a statute of repose is captioned "Statute of limitations." *See Byrd v. Trans Union LLC*, No. 3:09-609-JFA, 2010 WL 2555119, at *1 (D.S.C. June 18, 2010) (identifying the time limit under this heading as a statute of repose).

*Dutra Const. Co.*, 543 U.S. 481, 490-93 (2005) (reviewing the use of a contested statutory term in contemporary case law to derive its meaning); *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 (2003) (same).

Examples of such cases are too numerous to list exhaustively but include opinions from the Supreme Court and courts of appeal, including this court. *E.g., Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1790 (2010) (describing an unqualified bar on securities claims five years after the violation as part of "[t]he applicable statute of limitations"); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 n.8 (1991) (referring to a three-year repose period as "a portion of an express statute of limitations"); *Wike v. Vertrue, Inc.*, 566 F.3d 590, 595 (6th Cir. 2009) (courts "sometimes distinguish" statutes of limitations and repose but also "often employ these terms as synonyms"); *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1300 n.7 (4th Cir. 1993) ("Limiting periods for bringing court actions are here generally referred to as statutes of limitations, and a statute of repose is a subspecies."); *Alexander*, 952 F.2d at 1218 n.2 ("Although the statute is titled as a 'Statute of limitations,' we refer to it as a statute of repose. . . . Both types of statutes are often referred to as statutes of limitations."); *Abrams v. Civa Specialty Chem. Corp.*, 659 F. Supp. 2d 1225, 1234 n.13 (S.D. Ala. 2009) (citing other examples).

Courts even have referred to Section 13's three-year limit in particular as a statute of limitations. *E.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 (1976) ("Section 13 specifies a statute of limitations of one year . . . [but] not to exceed three years from the

time of offer or sale."); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 250 (2d Cir. 2007) (referring to "the Securities Act's one- and three-year statutes of limitations").

Defendants point to a handful of cases published before 1989 that recognized the distinction between statutes of repose and "ordinary statutes of limitations." *See, e.g.*, *Wayne v. Tenn. Valley Auth.*, 730 F.2d 392, 401-02 (5th Cir. 1984) (states have enacted statutory limits "labeled 'statutes of repose' in order to distinguish them from *ordinary* statutes of limitations" (emphasis added)); *Goad v. Celotex Corp.*, 831 F.2d 508, 511 (4th Cir. 1987) (contrasting policy purposes of ordinary statutes of limitations and statutes of repose); *Luzzader v. Despatch Oven Co.*, 834 F.2d 355, 358 (3d Cir. 1987) ("Statutes of repose, unlike *most* statutes of limitations, start to run . . . at the completion of certain conduct by the defendant." (emphasis added)).

Defendants also quote the rule that courts "normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co.*, 130 S. Ct. at 1795. Thus, they argue, Congress would have been aware of the cases cited above and would have referred to a statute of limitations only in its narrow sense. But Defendants' cited cases do not support their conclusion. The cases largely concern questions of equitable tolling or accrual, which are not at issue in this case. Moreover, in the quoted passages Defendants provide, courts describe the distinction between statutes of repose and "*ordinary* statutes of limitations" or "*most* statutes of limitations." The use of these modifiers can be reasonably understood to regard statutes of repose as one type of statute of limitations, a subcategory.

More important, Defendants do not account for the abundant examples of cases that use the term "statute of limitations" in the broad, generic sense and often treat statutes of repose as a subcategory. As the Second Circuit recently explained, "[a]lthough [the two terms] are distinct in theory, the courts . . . have long used the term 'statute of limitations' to refer to statutes of repose, including specifically with respect to § 13 of the Securities Act." *UBS Am.*, 712 F.3d at 142-43.

In sum, Defendants' reliance on case law to draw an ironclad distinction between statutes of limitation and statutes of repose is misplaced. The majority of the case law treats repose periods as a subcategory of statute of limitations.

d. *Rule against repeal by implication*

Finally, Defendants argue that construing the Extender Statute to include statutes of repose would amount to a repeal of Section 13's three-year period without express congressional intention, violating the rule that disfavors repeals by implication. *See Nat'l Ass'n. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 663-64 (2007).

This argument fails because, as we have concluded in this circuit, the Extender Statute does not repeal Section 13, implicitly or otherwise. It creates a separate limitations framework that functions as a narrow exception for actions brought by NCUA on behalf of failed credit unions. "[T]he new statute is simply a preemptive congressional resolution of a discrete controversy that arose long after [Section 13] was enacted. The [Extender Statute] simply addresses one particular application and carves out an exception. We see no repeal-by-implication problem." *Harris v. Owens*, 264 F.3d

1282, 1296 (10th Cir. 2001) (rejecting a repeal-by-implication argument regarding legislation governing tobacco settlement funds); *see also Strawser v. Atkins*, 290 F.3d 720, 733 (4th Cir. 2002) (creation of a "specific, discrete exception" is not a "repeal by implication"); *Greenless v. Almond*, 277 F.3d 601, 608 (1st Cir. 2002) ("carve out" is not a repeal by implication).

*   *   *

After closely examining the text of the Extender Statute—standing alone and in context—as well as the statutory purpose and uses of the term "statute of limitations" in federal legislation and case law, we find that each of these sources leads to the same conclusion:  the Extender Statute applies to Section 13's three-year repose period.[20]

---

[20] A majority of courts have concluded that similar extender statutes referring to "statutes of limitation" encompass statutes of repose. *E.g.*, *Waldburger*, 2013 WL 3455775, at *7, -- F.3d -- (CERCLA extender statute includes statutes of repose); *UBS Am.*, 712 F.3d at 141-44 (FHFA extender statute includes statutes of repose); *McDonald*, 548 F.3d at 779-84 (CERCLA extender statute includes statutes of repose); *NCUA v. Credit Suisse Sec. (USA) LLC*, 2013 WL 1411769, at * 8, -- F. Supp. 2d -- (D. Kan. 2013) (NCUA Extender Statute includes statutes of repose); *In re: Countrywide*, 900 F. Supp. 2d at 1062-67 (FHFA extender statute includes statutes of repose).

One circuit concluded differently regarding the CERCLA extender statute. *Burlington N. & Santa Fe Ry. v. Poole Chem. Co.*, 419 F.3d 355, 360-65 (5th Cir. 2005) (holding that CERCLA extender statute does not include statutes of repose). *But see McDonald*, 548 F.3d at 781-82 (extended critique of *Burlington*); *Waldburger*, 2013 WL 3455775, at *7, -- F.3d at -- (rejecting *Burlington* in favor of *McDonald*); *Abrams*, 659 F. Supp. 2d at 1231-1234, 1236 n.16 (same).  One district court held that the FDIC extender statute does not apply to a state statute of repose for purposes of whether an amended complaint could relate back to the filing of an original complaint. *Resolution Trust Corp. v. Olson*, 768 F. Supp. 283, 285 (D. Ariz. 1991).  Defendants also cite to two district court orders that the NCUA Extender Statute does not include statutes of repose. *NCUA v. Goldman Sachs & Co.*, No. cv-11-6521-GW (C.D. Cal. Sept. 4, 2012) (final order);

Continued . . .

Defendants' arguments do not convince us otherwise. We therefore affirm the district court's conclusion on this first issue and turn to the second issue in this appeal.[21]

## B. *Does the Extender Statute Apply to Statutory Claims?*

The Extender Statute sets a minimum limitations period for "any action brought by [NCUA] as conservator or liquidating agent." 12 U.S.C. § 1787(b)(14). The minimum period is the longer of: six years for "any contract claim" and three years for "any tort claim" *or* "the period applicable under State law." *Id.*

Defendants argue that the Extender Statute applies only to state common law

_____

Cont.

*NCUA v. RBS Sec., Inc.*, No. cv-11-5887-GW (C.D. Cal. Jan. 30, 2012) (tentative order not yet final). We have carefully reviewed the reasoning in these cases and do not find them to be persuasive.

[21] We need not consider whether we should apply the rule of "construing ambiguous statutes of limitations in Government action in the Government's favor." *O'Gilvie v. United States*, 519 U.S. 79, 92 (1996); *see also FDIC v. Former Officers & Directors of Metro. Bank*, 884 F.2d 1304, 1309 (9th Cir. 1989) (applying the rule in an agency action brought on behalf of a failed bank). The district court applied this rule, and NCUA urges us to follow suit. Defendants argue that this interpretive rule should not apply because NCUA brings claims on behalf of the credit unions and therefore has only the rights and benefits the credit unions would have if they had brought the actions themselves.

We see no reason why this rule would not apply to Securities Act claims by the NCUA, but it is not needed here. Of the two reasonable interpretations of the Extender Statute, one is distinctly more plausible even without the rule of favorable construction: that the Extender Statute includes periods of repose as a subcategory of statute of limitations.

claims.[22] This leads to two further arguments: First, they argue that the Extender Statute cannot apply to NCUA's state law claims because these claims are statutory and not common law claims. Second, Defendants argue that the Extender Statute cannot apply to the Securities Act claims because they are statutory claims and because they are federal, not state law, claims. As we already have discussed, without the Extender Statute, the Securities Act claims are untimely by virtue of Section 13's three-year repose period.

We discuss each of these arguments in turn.

1. **The Extender Statute and statutory claims**

Defendants argue that the Extender Statute does not apply to statutory claims. We discuss the ordinary meaning of the Extender Statute in context and conclude that it applies to statutory claims.

a. *The statutory language is ambiguous*

The Extender Statute applies to "any action brought by" NCUA. 12 U.S.C. § 1787(b)(14). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quotations omitted); *see also Cohen v. JP Morgan Chase & Co.*, 498 F.3d

---

[22] Defendants interpret the scope of the Extender Statute's application to types of claims as shown below:

|          | Statutory | Common law |
|----------|-----------|------------|
| Federal  | No        | No         |
| State    | No        | Yes        |

111, 117 (2d Cir. 2007) ("As the Supreme Court has frequently observed, use of the word 'any' in statutory text generally indicates Congress's intent to sweep broadly to reach all varieties of the item referenced."); *United Transp. v. Dole*, 797 F.2d 823, 829 (10th Cir. 1986) (interpreting the phrase "any action" expansively). The Extender Statute uses the word "any" four separate times in describing the types of claims it covers.

On the other hand, the Extender Statute's two-part limitations structure provides a minimum limitations period of six years for "any contract claim" and three years for "any tort claim." 12 U.S.C. § 1787(b)(14). Defendants argue that these provisions refer only to common law contract and tort claims and unambiguously exclude all statutory claims. They argue that Congress easily could have referred to *all* state law claims and that its choice to mention only these two categories, which they consider to be common law categories, should be interpreted as an exclusion of all other categories.

Defendants' theory rests entirely on the premise that Congress used the terms "contract claim" and "tort claim" in the narrowest possible sense, referring only to common law claims. It is possible but far from obvious that Congress adopted this narrow definition. The statute itself does not require this definition. For example, it does not refer to "common law." It refers to "*any* contract claim" and "*any* tort claim." 12 U.S.C. § 1787(b)(14)(A)(i) & (ii) (emphases added).

Both of these terms also have meanings much broader than those Defendants ascribe. A tort is often defined as "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, usu[ally] in the form of damages; a breach of duty that

-43-

the law imposes on persons who stand in a particular relation to one another." Black's

Law Dictionary 1626 (9th ed. 2010).[23] Similarly, the entry for contract includes this

definition: "1. An agreement between two or more parties creating obligations that are

enforceable or otherwise recognizable at law." *Id.* at 365. Neither definition excludes

statutory claims.[24]

---

[23] The fifth version of Black's Law Dictionary, which was current when FIRREA was enacted, contained a similar definition: "A private or civil wrong or injury, other than breach of contract, for which the court will provide a remedy . . ." Black's Law Dictionary 1335 (5th ed. 1979).

[24] Other courts have noted the broader meaning of these terms. "Courts often use the phrase 'sounding in tort' to distinguish a claim from one 'sounding in contract.' The distinction may affect such issues as remedies, statutes of limitations, or choice of law." *In re Holliday*, No. 03-00946, 2007 WL 4457925, at *1 (Bankr. S.D. Iowa Dec. 6, 2007) (unpublished) (federal statutory claims "sound[ed] in tort"); *see also Oriente Comm., Inc. v. Am. Flag Vessell*, *M/V Floridian*, 529 F.2d 221, 221-22 (4th Cir. 1975) (distinguishing federal statutory claims that "aris[e] out of tort" from those that "sound solely in contract").

Discussing the "commonly accepted meaning" of a tort claim, the Fifth Circuit explained that "[s]tatutes may create duties on which tort liability is premised[, but] . . . [n]ot all statutory claims sound in tort." *Rodriguez v. Christus Spohn Health Sys. Corp.*, 628 F.3d 731, 736 (5th Cir. 2010). "'The precise nature of the claim is ordinarily identified by examining the damages alleged: when the damages are purely economic, the claim sounds in contract, but a ... claim alleging damages for death or personal injury sounds in tort.'" *Id.* (quoting *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 705 (Tex. 2008)).

Kansas and California also use these broader meanings of tort and contract claims. In Kansas, "whether a claim sounds in tort or contract is determined by the nature and substance of the facts alleged in the pleadings," including "the nature of the duty alleged to have been breached." *David v. Hett*, 270 P.3d 1102, 1114 (Kan. 2011) (claim sounds in tort if plaintiffs allege breach of common-law or statutory duty independent from any contract); *see also Malone v. Univ. of Kan. Med. Ctr.*, 552 P.2d 885, 888 (Kan. 1976) (same).

Continued . . .

In short, the terms "tort claim" and "contract claim" can be read to encompass statutory and common law claims or only the latter. Because these terms as used in the Extender Statute are susceptible to more than one reasonable interpretation, they are ambiguous.

b. *Resolving ambiguity in the statutory language*

To resolve the ambiguity, we examine the purpose and origins of the statute. We conclude that Congress meant the Extender Statute to apply to statutory as well as common law claims.

i) <u>Statutory purpose</u>

Examining FIRREA's statutory purpose may help us to "decode[]" the Extender Statute's ambiguous text. *In re Geneva Steel Co.*, 281 F.3d at 1178. As we already have discussed, Congress enacted FIRREA to "enhance the regulatory and enforcement powers" of NCUA. Pub. L. No. 101-73, 103 Stat. 183 (preamble). FIRREA's sponsor explained that the statute's extender provisions should "be construed to maximize potential recoveries." 135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) (statement of Sen. Riegle).

_____

Cont.

   In California, "to determine whether [a claim] sounds in contract or in tort the *gravamen* of the facts giving rise to the right to recovery must be examined." *Mitchell Land & Imp. Co. v. Ristorante Ferrantelli, Inc.*, 158 Cal.App. 4th 479, 487 (Cal. Ct. App. 2007) (considering statutory claim); *see also Tameny v. Atl. Richfield Co.*, 610 P.2d 1330, 1334 (Cal. 1980) (considering statutory wrongful discharge claim).

Applying the Extender Statute to statutory claims serves the statute's purpose by providing NCUA sufficient time to investigate and file all potential claims once it assumes control of a failed credit union. *See UBS Am.*, 858 F. Supp. 2d at 316 (extender statute's purpose is to give federal agencies "more time to decide whether and how to pursue any claims [they] inherited" from failed financial institutions). By contrast, Defendants have pointed to nothing in the statute or its legislative history that demonstrates the statute's purpose would be served by limiting the Extender Statute to common law claims. Indeed, restricting the statute to such a narrow portion of potential claims would flatly contradict FIRREA's explicit purpose.

ii)    Origin of the Extender Statute

Section 2415 and its judicial interpretation elucidate the origin and meaning of the Extender Statute. Section 2415 is the general or default statute of limitations for all claims brought by the United States when no other federal statute of limitations applies. *See* 28 U.S.C. § 2415; *see also Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 860 (10th Cir. 1993); *United States v. Sunoco, Inc.*, 501 F. Supp. 2d 641, 648-49 (E.D. Penn. 2007). Before FIRREA, Section 2415 governed claims brought by NCUA and FDIC. *NCUA v. RBS Sec., Inc.*, 900 F.Supp.2d 1222, 1239 (D. Kan. 2012); *see, e.g.*, *Bachman*, 894 F.2d at 1237; *FDIC v. Hinkson*, 848 F.2d 432, 433 (3d Cir. 1988).

Congress used Section 2415 as a model in drafting FIRREA. *See supra* Section I.A.3 at 8-9. "When, as here, a statute 'is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'"

-46-

*United States v. Adame-Orozco*, 607 F.3d 647, 654 (10th Cir. 2010) (quoting Felix

Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537

(1947)).  This "old soil" includes the judicial precedent interpreting the precursor statute.

*See* Singer & Singer, 2B *Sutherland Statutory Construction* § 50:1, at 143 ("All

legislation is interpreted in the light of the . . . scheme of jurisprudence existing at the

time of its enactment.").  Courts "normally assume that, when Congress enacts statutes, it

is aware of relevant judicial precedent." *Merck & Co.*, 130 S. Ct. at 1795.  The judicial

precedent interpreting Section 2415 at the time the Extender Statute was enacted is

therefore relevant here.

When Congress drafted the Extender Statute, courts had often applied Section

2415 to statutory claims.  *E.g.*, *United States v. Deluxe Cleaners & Laundry, Inc.*, 511

F.2d 926, 929 (4th Cir. 1975) (applying Section 2415 to claim under Service Contract

Act of 1965); *United States v. Limbs*, 524 F.2d 799, 800 (9th Cir. 1975) (same, as to

Federal Employees' Compensation Act claim); *United States v. P/B STCO* 213, 756 F.2d

364, 370 (5th Cir. 1985) (same, as to Federal Water Pollution Control Act claim); *United

States v. Gera*, 409 F.2d 117, 119-20 (3d Cir. 1969) (same, as to Medical Care Recovery

Act claim); *FDIC v. Hudson*, 673 F. Supp. 1039, 1041 (D. Kan. 1987) (same, as to

multiple claims including a state corporate law claim).

Notably, *Limbs* clearly rejected arguments analogous to the Defendants' argument

here—that Section 2415 applied only to common law claims and not to statutory claims.

"The fact that the government's right to reimbursement derives from statute rather than

common law does not affect characterization of the claim as quasi-contractual" for purposes of applying Section 2415. 524 F.2d at 802.

This precedent shows that the terms "tort claim" and "contract claim" were construed broadly in the context of Section 2415. When Congress "transplanted" Section 2415's framework to the Extender Statute, it brought this "old soil" with it. *Adame-Orozco*, 607 F.3d at 654 (quotations omitted). If Congress had meant to curtail the scope of the limitations framework, it would have said so expressly.

*     *     *

Given the Extender Statute's purpose and history, we conclude that it applies to statutory claims as well as to common law claims. The Extender Statute therefore applies to NCUA's state law claims.

2. **The Extender Statute and federal claims**

Defendants argue that the Extender Statute does not apply to federal claims. We begin by reviewing the language of the Extender Statute and find its applicability to federal claims to be ambiguous. We then examine the language in context and conclude that the statute covers federal claims, including the Securities Act claims at issue here. Finally, we consider and reject Defendants' remaining arguments on this question.

a. *The statutory language is ambiguous*

As we previously discussed, the Extender Statute applies to "*any* action brought by" NCUA. 12 U.S.C. § 1787(b)(14) (emphasis added). The statute repeatedly uses the modifier "any" in describing the types of claims it covers. It does not expressly restrict

-48-

federal claims.

On the other hand, the statute refers only to "the period applicable under *State law*," and does not use the phrase "federal law." *Id.* (emphasis added). Specifically, the Extender Statute sets a limitations period for any action by NCUA, but allows the state law period to govern if it is longer than that provided in the Extender Statute. There is no similar provision that would allow a longer federal limitations period to govern.

We could easily infer from this omission that Congress meant the Extender Statute to trump any other federal limitations period. But Defendants infer much more. They argue that Congress omitted reference to other federal limitations not to exclude other federal *limitations periods*, but to exclude all federal *claims* from the Extender Statute's coverage. Looking only at the statute's language and without considering context, this interpretation is possible.

But a different construction is also reasonable: the Extender Statute sets a minimum limitations period for *any* action brought by NCUA, which includes federal and state actions. It then provides NCUA the benefit of even longer periods where allowed under state law but does not extend the same benefit for longer periods under federal law. Under this reading, it makes sense that the statute does not provide guidance for resolving conflicts between federal limitations periods because no such conflicts exist—the Extender Statute is a uniform limitations framework that governs all federal claims filed by NCUA on behalf of failed credit unions. Thus, when the Extender Statute applies, it displaces any other federal limitations period.

This second interpretation is more likely because the Extender Statute expressly covers "any action" and does not expressly exclude any type of claim from its coverage. Moreover, nothing in the statute's language suggests these references to state law define its scope. Rather, state law is mentioned as one of two alternative limitations periods. For example, the limitations period for any contract claim "shall be . . . the longer of (I) the 6-year period beginning on the date the claim accrues; *or* (II) the period applicable under State law." 12 U.S.C. § 1787(b)(14)(A)(i). The first alternative is plainly not limited to state law claims.

Under the more natural reading, the statutory language covers federal and state law claims. But because Defendants' interpretation is at least plausible, we find the language is ambiguous. We consult sources beyond the statutory text to resolve the ambiguity.

b. *Resolving ambiguity in the statutory language*

The purpose and origin of the Extender Statute indicate that it covers federal actions.

i) <u>Statutory purpose</u>

For the same reasons already discussed, statutory purpose supports the Extender Statute's application to federal actions. FIRREA's stated purpose includes "strengthen[ing] civil sanctions . . . for . . . damaging depository institutions and their depositors." Pub. L. No. 101-73, 103 Stat. 183. The Extender Statute's purpose is to facilitate recoveries by NCUA on behalf of failed credit unions. It fulfills this purpose by

-50-

providing sufficient time to investigate and file potential federal claims after assuming control of a failed credit union. *See UBS Am.*, 858 F. Supp. 2d at 316. These purposes are served by applying the Extender Statute to federal claims.

Consider the basic function of the Extender Statute: it sets a limitations period for "any action" brought by a *federal* agency in its capacity as conservator or liquidating agent of insolvent or undercapitalized *federally* insured credit unions. Many federal laws and potential federal actions are relevant in these circumstances. If Congress had meant to preserve the NCUA's ability to pursue only state claims, while excluding the many potential federal claims that would enable NCUA to fulfill its mission, it would have said so expressly. *See FHFA v. Countrywide*, 900 F. Supp. 2d at 1067 (rejecting defendant's "unlikely assertion that a '*federal* statute applying to a *federal* agency . . . *only* applies to *state* law claims'").

ii)   Origin of the Extender Statute

Section 2415 again provides insight. As we previously discussed, this provision served as a model when Congress drafted the Extender Statute in 1989. At that time, courts routinely applied Section 2415 to federal claims—including those brought by FDIC and NCUA. *E.g.*, *Deluxe Cleaners & Laundry, Inc.*, 511 F.2d at 929; *Limbs*, 524 F.2d at 800. Congress was presumably aware of this enforcement practice and "aware of relevant judicial precedent," *Merck & Co.*, 130 S. Ct. at 1795, when it transplanted this well-established limitations framework from Section 2415 to the Extender Statute. If

Congress had meant to exclude federal claims from the scope of the new statute, it would have said so expressly.

c. *Defendants' final arguments*

Defendants' two final arguments also fail.

First, Defendants argue that applying the Extender Statute to federal claims would produce absurd results if the statute displaced a longer federal limitations period. The only example Defendants point to is the Clayton Act, which contains a four-year limitations period. *See* 15 U.S.C. § 15b. We are not aware of any case in which NCUA or FDIC has brought a claim on behalf of a failed credit union under the Clayton Act, and Defendant has not cited any. But assuming such a claim is possible, the limitations period would not necessarily end sooner under the Extender Statute. The Extender Statute's three-year limit would not commence until NCUA took over the failed credit union, while the Clayton Act's four-year limit could commence earlier. The Extender Statute operates to enlarge the time limits in all or almost all cases, while providing a uniform limitations period for federal claims. The remote possibility that the time period could be contracted in a small number of hypothetical claims does not constitute an absurd result.

Second, Defendants argue in the alternative that the Extender Statute is a "gap filler" and applies only where no other federal limitations period exists. Aplt. Br. at 53. They cite to cases interpreting Section 2415 in this way and argue that Congress intended the same construction for the Extender Statute. Because an existing federal statute of

limitations is available—Section 13—Defendants argue that the Extender Statute should not apply. But Defendants overlook a key difference in the language of the two statutes that thwarts this argument. Section 2415 provides that its limitations period shall apply "except as otherwise provided by Congress." 28 U.S.C. § 2415. By contrast, Congress excluded this phrase when it drafted the Extender Statute. *See* 12 U.S.C. § 1787(b)(14). This specific exclusion indicates that Congress drafted the Extender Statute to provide a uniform limitations period for all federal claims brought by NCUA and not as a gap filler. "[C]ourts presume a different intent when a legislature omits words used in a prior statute on a similar subject." Singer & Singer, 2B *Sutherland Statutory Construction* § 51:2, at 212-13.

*     *     *

After careful review of the statutory language and its context, we hold that the Extender Statute applies to federal and state statutory claims.[25]

---

[25] Other courts also have concluded that materially similar extender statutes cover federal and state statutory claims. *E.g.*, *UBS Am.*, 712 F.3d at 143-44 (FHFA extender statute applies to federal and state securities claims); *FDIC v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) (unpublished) (FDIC extender statute applies to Securities Act claims); *FHFA v. Countrywide Fin. Corp.*, 2012 WL 5275327, at *2 (C.D. Cal. Oct. 18, 2012) (FHFA extender statute applies to statutory securities claims); *FDIC v. Zibolis*, 856 F. Supp. 57, 60-61 (D.N.H. 1994) (FDIC extender statute applies to state statutory claims, which could sound either in contract or tort for purposes of selecting the appropriate limitations period).

We are not aware of any court decision accepting Defendants' theory that this or any materially similar extender statute applies only to state common law claims.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court's denial of Defendants'
motion to dismiss.